1   Anthony J. Carucci (#301923)
    acarucci@swlaw.com
2   Mark O. Morris (*pro hac vice forthcoming*)
    mmorris@swlaw.com
3   Elisabeth M. McOmber (*pro hac vice forthcoming*)
    emcomber@swlaw.com
4   SNELL & WILMER L.L.P.
    600 Anton Blvd, Suite 1400
5   Costa Mesa, California 92626-7689
    Telephone:    714.427.7000
6   Facsimile:    714.427.7799

7   *Attorneys for Plaintiff Darrell Huntsman*

8                  UNITED STATES DISTRICT COURT

9        NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

10

| | |
|---|---|
| 11   DARRELL HUNTSMAN, an individual, | Case No.  23-6088 |
| 12                  Plaintiff, | **Darrell Huntsman's Complaint for:** |
| 13        v. | **(1) Breach of Contract;** |
| 14   FROST & SULLIVAN INC., a Delaware corporation; WYMAN BRAVARD, an | **(2) Breach of the Covenant of Good Faith and Fair Dealing;** |
| 15   individual; DAVID FRIGSTAD, an individual; and DOES 1 through 10, inclusive, | **(3) Fraudulent Inducement;** |
| 16                  Defendants. | **(4) Promissory Estoppel;** |
| 17 | **(5) Wrongful Discharge in Violation of Public Policy;** |
| 18 | |
| 19 | **(6) Retaliation;** |
| 20 | **(7) Restitution/Unjust Enrichment;** |
| 21 | **(8) Conversion;** |
| 22 | **(9) Accounting;** |
| 23 | **(10) California Unfair Competition Law;** |
| 24 | **(11) Breach of Fiduciary Duty;** |
| 25 | **(12) Violation of Cal. Labor Code § 202 – Unpaid Wages; and** |
| 26 | |
| 27 | **(13) Violation of Cal. Labor Code §§ 202 & 203 – Waiting Time Penalties** |
| 28 | **DEMAND FOR JURY TRIAL** |

Plaintiff Darrell Huntsman ("**Mr. Huntsman**"), through counsel, hereby files this complaint (the "**Complaint**") against Defendants Frost & Sullivan Inc. ("**Frost**"), Wyman Bravard ("**Mr. Bravard**"), and David Frigstad ("**Mr. Frigstad**") and seeks relief as follows:

### THE PARTIES

1.     Mr. Huntsman is an individual who resides in and is a citizen of Utah.

2.     On information and belief, Frost is a corporation organized under the laws of the State of Delaware with its claimed principal place of business currently in San Antonio, Texas. Frost also maintains an office in Santa Clara, California from which it routinely conducts business in, from, and directed to California and, on information and belief, is licensed and qualified to do business in California. For much of the time Mr. Huntsman was employed by Frost, Frost openly maintained its principal place of business in Santa Clara, California, close to Mr. Frigstad's home in California, held all of its board meetings in or from its Santa Clara office, and the majority of Frost's revenues and payroll expenses company-wide were generated in California.

3.     On information and belief, Mr. Bravard is, and during all times mentioned in this Complaint was, an individual residing in Connecticut, and is a Key Principal, Majority Shareholder, Director, and Officer of Frost. Mr. Bravard routinely conducted business on behalf of Frost in, through, and directed to its Santa Clara, California office, including, but not limited to, participating in board meetings, overseeing Frost's revenue and other expenses, and planning and carrying out the conduct set forth in this Complaint in conjunction with Mr. Frigstad and on behalf of Frost.

4.     On information and belief, Mr. Frigstad is and during all times mentioned in this Complaint was, an individual residing in California and is a Key Principal, Majority Shareholder, Director, and Officer of Frost.

5.     Does 1-10 are persons or entities responsible, in whole or in part, for the wrongdoing alleged herein ("Doe Defendants"). Mr. Huntsman is informed and believes, and based thereon, alleges that each of the Doe Defendants participated in, assisted, endorsed, or were otherwise involved in the acts complained hereof, and that they have liability for such acts. Mr. Huntsman will amend this Complaint if, and when, the identities and details of involvement of such persons or entities becomes known.

6.     Frost, Mr. Bravard, Mr. Frigstad, and the Doe Defendants are collectively referred to herein as "Defendants."

7.     Mr. Huntsman is informed and believes, and on that basis alleges, that at all times relevant herein, each of the above-named defendants completely dominated and controlled one another, such that they are one and the same. That control and dominance results in interdependence, overlap, and commonality between and amongst these defendants, and each of these defendants are the alter ego of one another acting as a single enterprise. For these reasons and others, adherence to the fiction of the separate existence of defendants would sanction a fraud and promote injustice. Frost, Mr. Bravard, Mr. Frigstad, and the Doe Defendants are the alter egos of one another, acting as a single enterprise, jointly and severally with respect to all acts referenced in this Complaint, and each is fully responsible and liable for all obligations and debts of each other, including the claims asserted herein by Mr. Huntsman.

## JURISDICTION

8.     The Court has original jurisdiction of the subject matter of this action under 28 U.S.C. § 1332(a) because this is a civil action between citizens of different states, where the matter in controversy exceeds $75,000, exclusive of costs and interest.

## DIVISIONAL ASSIGNMENT

9.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred within this judicial district. Specifically, the contracts that are the subject of this action were entered into and were to be performed, in part, in Santa Clara, California. Divisional Assignment in San Jose is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events giving rise to the claim occurred within this division, and the contracts that are the subject of this action were entered into and were to be performed, in part, in Santa Clara, California.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

### GENERAL ALLEGATIONS

**A.     Frost's Business and Mr. Huntsman's Employment with Frost[1]**

10.     Frost is a privately held international information and growth advisory consultancy company.

11.     For almost 40 years, Mr. Frigstad and Mr. Bravard have been the key principals and principal shareholders at Frost. On information and belief, Mr. Frigstad and Mr. Bravard each hold 41% of Frost's shares and Mr. Frigstad additionally has control over an additional 14% of Frost's shares held by the Frost & Sullivan Institute, a non-profit founded by Mr. Frigstad who serves as its Executive Director.

12.     Mr. Huntsman was introduced to Frost through Satori Capital, a one-time potential investor in Frost. While Satori did not ultimately invest in Frost, it recommended Huntsman to Frost for the CEO position.

13.     Mr. Huntsman was initially hired by Frost in August 2019 as its Chief Operating Officer. He was quickly promoted to CEO of Frost and served in that position from fall of 2019 to December 2022.

14.     While he was employed by Frost, Mr. Huntsman reported directly to Frost's co-founders and board members Mr. Frigstad and Mr. Bravard and they approved his compensation structure.

15.     Mr. Huntsman's compensation included an annual base salary of $275,000, with annual pay increases, a bonus structure and a promised amount of 5% equity in the company

16.     Mr. Huntsman signed the offer letter setting out the general terms of his employment on or around August 5, 2019. *See* Offer Letter, attached as Exhibit 1. While the letter was sent by Frost's HR Director, as indicated above, Mr. Huntsman negotiated the terms with Frost's principals and majority shareholders, Mr. Frigstad and Mr. Bravard, and Mr. Frigstad and Mr. Bravard approved them.

---

[1] All headings herein are for reference only and in no way limit the allegations to any particular issue or claim for relief.

17.     Mr. Huntsman agreed to a lower-than-market salary and bonus structure in light of the promise of significant value in promised equity, which represented the majority of his expected compensation.

18.     Mr. Huntsman relied on the promises of bonuses and equity that were made by Frost, Mr. Frigstad, and Mr. Bravard in agreeing to take the position with Frost and would not have taken the position had these bonuses and equity not been offered.

19.     Although well past the six-month period in Mr. Huntsman's employment agreement, as part of the equity promise, on or around August 1, 2020, the Company established a Compensation Committee and directed the Committee to create an employee stock option plan, through which Mr. Huntsman would be granted his 5% equity.

20.     As of the date of this filing, even though he has met all conditions to earning the equity, Mr. Huntsman has not been granted his promised equity. Likewise, Mr. Huntsman has not been paid his bonuses, annual pay increases, and portions of his salary withheld during the Covid-19 pandemic, as he prioritized ensuring that Frost's other employees had their salaries reinstated and that the outstanding bonuses owed to them were paid.

**B.      Mr. Huntsman's Success in Making Frost Financially Stable and Leading it Through the Covid-19 Crisis**

21.     When Mr. Huntsman joined Frost, it was in dire financial straits—it had tens of millions in losses from 2010-2019, it owed millions of dollars in unpaid employee compensation, it was not in compliance with certain debt covenants, and independent auditors had questioned its continued viability.

22.     Mr. Huntsman instituted a two-phase plan to get the company back on track. The first phase involved paying off debts, downsizing offices, cutting costs, reorganizing the company, and regaining compliance with debt covenants. The second phase involved emphasis on future product development and sources of revenue.

23.     While he was CEO and implemented these measures, the company's audits were brought current, debt was refinanced on better terms, and through process improvements, staff reductions, real estate cost reductions, and outside vendor cost reductions, millions of dollars were

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

saved. As a result, the company turned around and began to be profitable again. In fact, Mr. Huntsman led Frost to its best financial performance in 2021.

24.     Further, as CEO Mr. Huntsman successfully steered Frost through the Covid-19 pandemic. He implemented across-the-board pay cuts in April 2020 to ensure that the company would not have to lay off any employees. While Mr. Huntsman, the other executives, and Frost's employees took these pay cuts, Mr. Bravard and Mr. Frigstad refused to take the cut and did not limit their personal expenses being paid for by the company. Mr. Huntsman was able to restore employee compensation by August 2020, but was criticized for doing so by Mr. Bravard and Mr. Frigstad.

25.     When the federal government began issuing Paycheck Protection Program ("**PPP**") loans in August 2020, Frost qualified for and received a $5 million loan, which was then forgiven and did not have to be repaid by Frost.

26.     As the business effects of the pandemic eased, Frost continued to prosper under Mr. Huntsman's leadership and profits increased, with historically high profits in 2021. Although Mr. Huntsman's responsibilities were significantly diminished in 2022 and more control was commandeered by Mr. Frigstad, Mr. Bravard and the other two Executive Board members, the effect of Mr. Huntsman's successful leadership remained, with strong profitability in 2022 that was better than any of the previous decade prior to Mr. Huntsman joining the company.

**C.     Mr. Frigstad and Mr. Bravard Attempt to Misappropriate Frost Funds and Falsify a Second-Round PPP Application**

27.     As the company's profits increased during Mr. Huntsman's tenure as CEO, Mr. Bravard and Mr. Frigstad began to reassert themselves in the company's business dealings and resist Mr. Huntsman's and Frost's CFO David Gens's efforts to implement better governance processes and financial controls.

28.     When the second round of federal PPP loans became available, Mr. Huntsman asked Mr. Gens if Frost qualified and was told that it did not. Mr. Gens documented that Frost was not eligible for the PPP2 loan in writing to Mr. Huntsman and to Frost's board.

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

29.     But in April 2021, Mr. Gens told Mr. Huntsman that he had discovered that Mr. Bravard and Executive Board member Krishna Srinivasan had, without either Mr. Huntsman's or Mr. Gens's knowledge or the knowledge of other board members, applied for the second-round PPP loan and obtained a loan of $2 million.

30.     Mr. Gens told Mr. Huntsman that he had obtained and reviewed the PPP2 loan application submitted by Mr. Bravard and Mr. Srinivasan, and that it contained information that Mr. Gens believed to have been falsified.

31.     Mr. Huntsman then informed the board of this situation with the PPP2 loan, as well as his suspicion that Mr. Bravard and Mr. Srinivasan were attempting to siphon the loan funds into their personal accounts.

32.     When Mr. Frigstad, Mr. Bravard, and Mr. Srinivasan did not attend the board meetings Mr. Huntsman convened to address the PPP2 loan issue, Mr. Huntsman and the chair of Frost's Governance Committee hired a private law firm to perform an independent investigation of the Company's financial operations and governance.

33.     On information and belief, Mr. Gens also discovered other improprieties involving Mr. Frigstad, Mr. Bravard, and Mr. Srinivasan that he reported to Mr. Huntsman, including concealing transactions in 2019 from Frost's senior lender where the senior lender's consent was required.

34.     On information and belief, when Mr. Gens questioned Mr. Srinivasan and Mr. Frigstad about this situation, they each indicated that Mr. Srinivasan would intentionally fail to review the pertinent financial agreements so that Mr. Srinivasan could claim a lack of knowledge and allow Mr. Frigstad to go forward with a transaction.

35.     With Mr. Huntsman's approval, Mr. Gens disclosed this issue to the senior lender and obtained its consent for the two transactions.

36.     Both Mr. Huntsman and Mr. Gens also tried to get Mr. Bravard and Mr. Frigstad to implement a plan to pay over $10 million in unpaid bonuses owed to Frost's employees. Mr. Bravard and Mr. Frigstad continually sought to delay and avoid paying this compensation rightfully owed to Frost's employees even though Frost had the money to make the payments based in large

part on Mr. Huntsman successful efforts in leading the company. And despite not paying Frost's employees, Mr. Bravard's, Mr. Frigstad's, and Mr. Srinivasan's compensation and bonuses were being paid in full at all times.

37.     In addition, Mr. Gens also discovered and reported to Mr. Huntsman that Mr. Frigstad and Mr. Bravard were using Frost to run fraudulent expenses through the company and claim improper tax deductions for personal expenses—including using the same receipt for landscaping expenses over the course of multiple months, expensing personal life insurance to the company, and expensing other non-tax-deductible personal expenses to the company for such things as fine wine and expensive overseas family vacations. On information and belief, Mr. Bravard and Mr. Frigstad take around $500,000 per year in improper personal expenses, while they continue to refuse to pay Mr. Huntsman, other executives, and Frost's employees their earned compensation.

**D.     Frost's Retaliation Against Mr. Huntsman and Mr. Huntsman's Wrongful Termination**

38.     Mr. Frigstad and Mr. Bravard, who together control a supermajority of Frost's shares, reacted to Mr. Huntsman's efforts to address the falsified PPP2 loan and other financial improprieties by convening a shareholder meeting in June of 2021 to adopt revised by-laws, reconstitute the board to remove all members other than themselves, including Mr. Huntsman and Mr. Gens, and dissolve all oversight committees of the board such as the Audit and Finance Committee, Compensation Committee, and Governance Committee. They also terminated the independent law firm investigation. This was the beginning of Frost's, Mr. Frigstad's and Mr. Bravard's acts of retaliation against Mr. Huntsman.

39.     The retaliatory acts continued from there. Mr. Frigstad created an Executive Board comprised of himself, Mr. Bravard, Mr. Srinivasan, and Mr. Aroop Zushi.  The Executive Board provides strategic oversight and guidance to the entire Frost & Sullivan team . . ." despite Mr. Huntsman's title of CEO, he was not invited to be a part of the Executive Board and its decisions.

40.     Then, in October of 2021, Mr. Frigstad and Mr. Bravard reincorporated the business from California to Delaware in an attempt to avoid California's employee laws and to avoid having

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626/7689

to proceed with a lawsuit that had been filed by Mr. Gens in California, which was based on unpaid compensation to Mr. Gens. Again, despite his title as CEO, Mr. Huntsman was not informed of the reincorporation by Mr. Frigstad, Mr. Bravard, or the other two Executive Board members and only learned about it from Mr. Gens.  Looking into the reincorporation for himself, Mr. Huntsman saw that he was not registered as an officer of the company or its CEO. This additionally demonstrated the acts of retaliation being taken against Mr. Huntsman by Frost, Mr. Frigstad, and Mr. Bravard.

41.    Soon thereafter Mr. Frigstad and Mr. Bravard further retaliated against Mr. Huntsman by significantly reducing his responsibilities and eliminating his authority over multiple departments, including new product development, finance, IT, and human resources. By around April 2022, Mr. Huntsman's role had been reduced to only select operational responsibilities, essentially eviscerating his ability to function as the CEO.

42.    Mr. Frigstad further undermined Mr. Huntsman by telling employees that Mr. Huntsman would be leaving the company. This was prior to any agreement reached for a separation.

43.    With his position and authority so diminished, Mr. Huntsman did not see a way forward with Frost and began discussion of an exit plan with Mr. Frigstad and Mr. Bravard.

44.    Mr. Huntsman raised the issue of his unpaid compensation as part of these discussions. This included approximately $360,000 in unpaid bonuses, repayment of back compensation withheld during Covid and payment of his annual pay increase in the amount of approximately $130,000, and the value of his equity in the company totaling approximately $5 million to $6 million.

45.    Although Mr. Frigstad and Mr. Bravard had promised Mr. Huntsman his equity and Mr. Huntsman had relied on that promise, as time went on he saw the long and consistent pattern of Mr. Frigstad and Mr. Bravard failing to honor past equity plans and he also became aware of their pattern of failing to pay employees their earned compensation and then using their power over the employees' livelihoods to "bully" them into accepting this malfeasance or lose their job. Under such untenable behavior and circumstances and in an effort to make himself whole in exiting the company, Mr. Huntsman made a non-cash proposal to license his equity in exchange for being able to develop a new product line venture using Frost's resources, which Mr. Frigstad met with

1  approval and enthusiasm. When Mr. Huntsman pushed Mr. Frigstad and Mr. Bravard to move

2  forward with negotiations for his departure, they redrafted the proposed license agreement to

3  require Huntsman to license his equity, but now precluded him from using Frost's resources, talking

4  to customers, soliciting employees, or using Frost's content. This rendered the proposed agreement

5  valueless to Mr. Huntsman and the parties did not agree to or enter into any license agreement or

6  other agreement regarding Mr. Huntsman's equity in Frost.

7      46.    Frost issued Mr. Huntsman a termination notice effective December 31, 2022, and

8  has not paid his unpaid compensation for bonuses, backpay, pay increases, or his equity share.

9                        **FIRST CAUSE OF ACTION**

10                  **(Breach of Contract – Against All Defendants)**

11     47.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint

12  as if fully set forth herein.

13     48.    Mr. Huntsman was initially hired by Frost in August 2019 as its Chief Operating

14  Officer. He was quickly promoted to CEO of Frost and served in that position from fall of 2019 to

15  December 2022.

16     49.    Mr. Huntsman and Frost entered into a valid and enforceable employment

17  agreement pursuant to terms known to and approved by Mr. Frigstad and Mr. Bravard.

18     50.    Those terms included salary, bonuses, and equity in the company, as well as benefits

19  such as medical, dental, vision, life insurance, disability plans, paid vacation and sick leave, paid

20  holidays, and 401(k) benefits.

21     51.    Although well past the six-month period in Mr. Huntsman's employment

22  agreement, as part of the equity promise, on or around August 1, 2020, the Company established a

23  Compensation Committee and directed the Committee to create an employee stock option plan,

24  through which Mr. Huntsman would be granted his 5% equity.

25     52.    Mr. Huntsman agreed to a lower-than-market salary in light of the promises of

26  bonuses and equity that were made by Frost, Mr. Frigstad, and Mr. Bravard, and he relied on the

27  promises of bonuses and equity in agreeing to take the position with Frost, and he would not have

28  taken the position had these bonuses and equity not been offered in addition to the agreed salary.

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

53.    Mr. Huntsman relied in particular on the promise of significant value in equity, which represented the majority of his expected compensation.

54.    The bonuses earned by Mr. Huntsman while he was employed by Frost but that he was not paid total approximately $360,000.

55.    The equity Mr. Huntsman was promised but did not receive was 5% of the company's shares, with an estimated value of approximately $5 million to $6 million.

56.    Mr. Huntsman is also owed approximately $130,000 in repayment of back compensation withheld during Covid and unpaid annual pay increases.

57.    Mr. Huntsman complied with all material terms of the employment agreement.

58.    Frost, Mr. Frigstad, and Mr. Bravard breached the employment agreement when they retaliated against Mr. Huntsman by forcing him out of his position as CEO and refused to pay him his earned compensation, bonuses, and the value of his promised equity.

59.    As a result of Frost's breaches, Mr. Huntsman was damaged in an amount to be proven at trial, including, but not limited to, costs, fees, and interest as may be assessed by law, but no less than $6,490,000.

## SECOND CAUSE OF ACTION

**(Breach of the Implied Covenant of Good Faith and Fair Dealing – Against All Defendants)**

60.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

61.    A covenant of good faith and fair dealing is implied in all contracts to prevent parties from engaging in conduct that frustrates the other party's benefits under the contract.

62.    Mr. Huntsman and Frost entered a valid and enforceable employment agreement pursuant to terms known to and approved by Mr. Frigstad and Mr. Bravard.

63.    Those terms included salary, bonuses, and equity in the company, as well as benefits such as medical, dental, vision, life insurance, disability plans, paid vacation and sick leave, paid holidays, and 401(k) benefits.

64.    Although well past the six-month period in Mr. Huntsman's employment agreement, as part of the equity promise, on or around August 1, 2020, the Company established a

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

Compensation Committee and directed the Committee to create an employee stock option plan, through which Mr. Huntsman would be granted his 5% equity.

65.     Mr. Huntsman agreed to a lower-than-market salary in light of the promises of bonuses and equity that were made by Frost, Mr. Frigstad, and Mr. Bravard, he relied on the promises of bonuses and equity in agreeing to take the position with Frost, and he would not have taken the position had these bonuses and equity not been offered in addition to the agreed salary.

66.     Mr. Huntsman relied in particular on the promise of significant value in equity, which represented the majority of his expected compensation.

67.     Mr. Huntsman complied with all material terms of the agreement.

68.     As an implied covenant of the employment agreement, Frost, Mr. Frigstad, and Mr. Bravard promised in good faith to pay Mr. Huntsman salary, bonuses, and equity.

69.     Frost, Mr. Frigstad, and Mr. Bravard breached this implied covenant by failing to pay Mr. Huntsman his earned compensation, bonuses, and equity in the company.

70.     As a result of Frost's breaches, Mr. Huntsman was damaged in an amount to be proven at trial, including, but not limited to, costs, fees, and interest as may be assessed by law, but no less than $6,490,000.

**THIRD CAUSE OF ACTION**

**(Fraudulent Inducement – All Defendants)**

71.     Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

72.     Mr. Huntsman negotiated with Frost, Mr. Frigstad, and Mr. Bravard prior to accepting his position at Frost and they agreed to the terms of his employment, which included a lower-than-market salary of $275,000 as well as a bonus structure and a promise of 5% equity in Frost.

73.     Mr. Huntsman accepted the offer of employment and began working for Frost as COO in August 2019.  He was then quickly promoted to CEO as his offer contemplated and began working in that position in November 2019.

COMPLAINT

74.     In taking the position of COO and then CEO, Mr. Huntsman knew that if he could improve Frost's financial condition – which he then did during his approximately three years with Frost, the 5% equity would have significant value and would represent the majority of his compensation over a several year period.

75.     Mr. Huntsman believed and relied on the promises of bonuses and equity in agreeing to take the position with Frost and he performed under his employment agreement. He would not have taken the position had these bonuses and equity not been offered in addition to the agreed salary.

76.     Defendants knew that Mr. Huntsman was relying on the promises of compensation, bonuses, and equity in accepting employment with Frost, but on information and belief they knew at the time they made these promises that they were fraudulent and that they did not intend to and in fact did not provide Mr. Huntsman with the promised compensation, bonuses, or equity, depriving him of employment opportunities, income, and property in the form of equity ownership.

77.     Because of their conduct, Defendants gained an advantage over Mr. Huntsman because they wrongfully deprived him of his promised compensation, including bonuses and his 5% ownership interest in Frost, to his detriment while Defendants benefited from Mr. Huntsman's performance pursuant to his employment agreement.

78.     As a direct and foreseeable result of Defendants' conduct, Mr. Huntsman has been damaged in an amount to be proven at trial, including, but not limited to, costs, fees, and interest as may be assessed by law, but no less than $6,490,000.

79.     Mr. Huntsman is informed and believes that by acting in the manner that they did, Defendants' demonstrated fraud, oppression, and malice, and the intent to deprive Mr. Huntsman of his respective rights, thus justifying an award of punitive and exemplary damages in a sum according to proof.

///

///

4888-6114-3953.5

COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626/7689

**FOURTH CAUSE OF ACTION**

**(Promissory Estoppel – Against All Defendants)**

**(Pled in the Alternative)**

80.     Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

81.     Before Mr. Huntsman began his employment with Frost, Defendants promised him that in exchange for his services as COO and then CEO, he would receive a salary, bonuses, and 5% equity of Frost.

82.     That promise was memorialized by members of the Board of Directors, primarily Mr Frigstad and Mr. Bravard.

83.     In reasonable reliance on that promise, Mr. Huntsman performed under the employment agreement and provided his contributions to Frost, which resulted in a significant improvement in Frost's financial condition and value.

84.     Defendants have not performed according to their promise by not honoring or compensating Mr. Huntsman for his employment as COO/CEO in the form of salary, bonuses, and 5% equity in Frost that he earned and is owed.

85.     Mr. Huntsman has been damaged by his reliance on Defendants' promises and injustice can only be avoided by enforcement of Defendants' promises in an amount to be proven at trial, including, but not limited to, costs, fees, and interest as may be assessed by law, but no less than $6,490,000.

**FIFTH CAUSE OF ACTION**

**(Wrongful Discharge in Violation of Public Policy – Against All Defendants)**

86.     Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

87.     Mr. Huntsman was an employee of Frost who was hired following negotiation with and the approval of Mr. Frigstad and Mr. Bravard.

88.     Mr. Huntsman was terminated by Frost and on information and belief Frost did so at the direction of Mr. Frigstad and Mr. Bravard.

89.    Frost, Mr. Frigstad, and Mr. Bravard's termination of Mr. Huntsman was substantially motivated by a violation of public policy because it occurred due to Mr. Huntsman's efforts to investigate and address Mr. Frigstad and Mr. Bravard's illegal conduct in fraudulently obtaining a PPP2 loan, which were provided by the U.S. Government only for the purpose of assisting businesses continuing to struggle due to the Covid-19 pandemic, and because the motives for the loan were financial improprieties such as improper expenses and tax deductions and failure to pay Frost's employees millions of dollars in unpaid bonuses.

90.    When Mr. Huntsman brought these issues to the board's attention and began an independent investigation using an outside law firm, Mr. Frigstad and Mr. Bravard removed him from the board, stopped the investigation, stripped him of almost all of his responsibilities as CEO, and then fired him.

91.    Mr. Huntsman's wrongful termination caused him to suffer and continue to suffer substantial economic losses, including, but not limited to, lost earnings, lost bonuses, lost equity in Frost, lost employment benefits and opportunities, and other losses to be proven at trial.

92.    As a direct and foreseeable result of Defendants' conduct, Mr. Huntsman has been damaged in an amount to be proven at trial, including, but not limited to, costs, fees, and interest as may be assessed by law, but no less than $6,490,000.

93.    Mr. Huntsman is informed and believes that by acting in the manner that they did, Defendants' demonstrated fraud, oppression, and malice, and the intent to deprive Mr. Huntsman of his respective rights, thus justifying an award of punitive and exemplary damages in a sum according to proof.

**SIXTH CAUSE OF ACTION**

**(Retaliation – Against All Defendants)**

94.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

95.    During Mr. Huntsman's employment with Frost, California Labor Code section 1102.5 was binding on Frost.

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

96.     California Labor Code section 1102.5(b) prohibits employers from retaliating against an employee for disclosing information regarding a violation or noncompliance with the law to a person with authority over the employee or an employee who has the authority to investigate, discover, or correct the violation or noncompliance.

97.     Regulation of wages, hours, and working conditions is critical for protecting employees in California as well as integral to maintaining the general welfare of the State's population. The full payment of all earned wages is one of California's fundamental public policies. Wages include equity compensation such as restricted stock. Labor Code sections 201, 204, and 216 require an employer to promptly pay employees their earned wages. Labor Code section 232 prohibits an employer from discriminating against an employee that discusses their wages. Labor Code section 232.5 protects an employee's right to discuss working conditions.

98.     18 U.S.C. § 1344 prohibits knowingly obtaining money from a financial institution by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1014 prohibits making false statements to a financial institution.

99.     I.R.C. § 7201 prohibits a taxpayer from filing a false return that omits income or claims deductions to which the taxpayer is not entitled.

100.    When Mr. Huntsman learned that Defendants had submitted a fraudulent PPP2 loan, had obtained a PPP2 loan based on false pretenses, were not paying Frost employees their earned wages, and had engaged in tax fraud and reported these issues to Mr. Frigstad, Mr. Bravard, and the Frost Board, he had a good faith belief that he was properly reporting that Defendants were violating Federal Law, the California Labor Code, and California public policy to persons with authority over the him and/or who had the authority to investigate, discover, or correct the violation or noncompliance, as Mr. Frigstad and Mr. Bravard were the founders of Frost, were board members, and held a supermajority of Frost's shares.

101.    Mr. Huntsman's reporting of these issues to Frost, Mr. Frigstad, and Mr. Bravard caused them to retaliate against him by removing him from the board, shutting down his efforts to investigate and correct their illegal conduct, taking away his authority to conduct his work as Frost's CEO, and then firing him.

102.    As a direct, foreseeable, and proximate result of Defendants' conduct, Mr. Huntsman suffered and continues to suffer substantial economic losses, including, but not limited to lost earnings, lost bonuses, lost equity in Frost, lost employment benefits and opportunities, fees and costs in bringing this action, and other losses to be proven at trial.

103.    As a direct, foreseeable, and proximate result of Defendants' conduct, Mr. Huntsman has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and pain and anguish, all to his damage in a sum to be established according to proof at trial.

104.    Mr. Huntsman is informed and believes that by acting in the manner that they did, Defendants' demonstrated fraud, oppression, and malice, and the intent to deprive Mr. Huntsman of his respective rights, thus justifying an award of punitive and exemplary damages in a sum according to proof.

### SEVENTH CAUSE OF ACTION

### (Restitution/Unjust Enrichment – Against All Defendants)

105.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

106.    Mr. Huntsman conferred a benefit on Defendants by performing his services as COO and CEO and substantially improving Frost's financial success including, but not limited to, achieving record profits.

107.    As described above, Defendants withheld Mr. Huntsman's earned compensation without any reason.

108.    As a result, Defendants have been unjustly enriched in the form of receiving the benefit of Mr. Huntsman's services and retaining the compensation owed to him, including his promised 5% equity share in the company.

109.    Mr. Huntsman has been damaged by Defendants' wrongful withholding of his compensation in an amount to be proven at trial.

///

///

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

**EIGHTH CAUSE OF ACTION**

**(Conversion - Against All Defendants)**

110.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

111.    Defendants unilaterally retained compensation owed to Mr. Huntsman, including withheld salary, bonuses, and his promised 5% equity share.

112.    Upon information and belief, Defendants have exercised willful and unlawful dominion and control over the amount of compensation owed to Mr. Huntsman by refusing to pay him what he was promised and owed for work he performed to the benefit of Frost, Mr. Frigstad, and Mr. Bravard.

113.    Mr. Huntsman did not consent to Defendants' actions.

114.    Mr. Huntsman was entitled to possession of the converted compensation at the moment Defendants withheld payment of his compensation.

115.    As such, Defendants have converted money from Mr. Huntsman and damaged Mr. Huntsman in an amount that is capable of identification to be proven at trial.

116.    Mr. Huntsman is informed and believes that by acting in the manner that they did, Defendants' demonstrated fraud, oppression, and malice, and the intent to deprive Mr. Huntsman of his respective rights, thus justifying an award of punitive and exemplary damages in a sum according to proof.

**NINTH CAUSE OF ACTION**

**(Accounting – Against All Defendants)**

117.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

118.    Defendants owe Mr. Huntsman his earned compensation in the form of withheld salary including unpaid annual increases, bonuses, and his 5% equity share and are improperly continuing to withhold it.

119.    Because Defendants have control over Frost and terminated Mr. Huntsman, the precise value of Mr. Huntsman's rights and interests is unknown and an accounting, including, but

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

1  not limited to, review and analysis of financial records and other documents, is necessary to

2  determine the value of Mr. Huntsman's rights and interests.

3  ### TENTH CAUSE OF ACTION

4  **(California Unfair Competition Law – Against All Defendants)**

5  120.      Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint

6  as if fully set forth herein.

7  121.      California's Unfair Competition Law ("UCL"), California Business & Professions

8  Code Section 17200 *et seq.*, protects both consumers and competitors by promoting fair

9  competition in commercial markets for goods and services. The UCL prohibits any unlawful,

10  unfair, or fraudulent business act or practice. A business practice need only meet one of the three

11  criteria to be considered unfair competition. An unlawful business practice is anything that can

12  properly be called a business practice and that at the same time is forbidden by law.

13  122.      As described above, Defendants have violated the "unlawful" prong of the UCL in

14  that Defendants' conduct violated numerous provisions of California's Labor Code.

15  123.      Defendants have violated the "unfair" prong of the UCL in that they gained an unfair

16  business advantage by not complying with California's Labor Code. Further, any utility for

17  Defendants' conduct is outweighed by the gravity of the consequences to Mr. Huntsman because

18  Defendants' conduct offends public policy.

19  124.      Mr. Huntsman seeks to enforce important rights affecting the public interest within

20  the meaning of California Code of Civil Procedure Section 1021.5.

21  125.      As a result of Defendants' illegal conduct and its willful violations of California

22  Business & Professions Code Section 17203, Mr. Huntsman and other Frost employees have lost

23  money and suffered harm.

24  126.      Under California Business & Professions Code Section 17203, Mr. Huntsman seeks

25  an order enjoining Defendants from continuing to engage in the described unfair and unlawful

26  conduct.

27  127.      Under California Business and Professions Code Section 17200 *et seq.*, Mr.

28  Huntsman seeks the restitution of the wages withheld and benefits wrongfully retained by

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626/7689

1  Defendants, an award of attorneys' fees under California Code of Civil Procedure Section 1021.5,

2  and an award of costs.

3  **ELEVENTH CAUSE OF ACTION**

4  **(Breach of Fiduciary Duty – Against Mr. Frigstad, Mr. Bravard, and Does 1-10)**

5  128.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint

6  as if fully set forth herein.

7  129.    At all times relevant herein, Mr. Frigstad and Mr. Bravard were principals, directors,

8  and majority shareholders of Frost and, as such, stood in a fiduciary relationship of trust and

9  confidence with Mr. Huntsman, by reason that Mr. Huntsman was supposed to have a vested,

10  minority interest pursuant to the 5% ownership interest he was promised.

11  130.    Mr. Frigstad and Mr. Bravard abused their positions as majority shareholders and

12  directors of Frost, and abused the trust that Mr. Huntsman and other minority shareholders had in

13  them by their entering into a series of self-dealing transactions that personally benefitted Mr.

14  Frigstad and Mr. Bravard to the detriment of Mr. Huntsman.

15  131.    Mr. Frigstad and Mr. Bravard have breached their fiduciary duties to Mr. Huntsman

16  and other minority shareholders by, among other things, (i) engaging in transactions on behalf of

17  Frost for their own personal benefit, including, but not limited to, falsely claiming personal

18  expenses as business expenses, claiming tax deductions for non-deductible expenses, and

19  fraudulently obtaining a PPP2 loan from the U.S. Government; (ii) failing to obtain the approval

20  the board and/or other shareholders before engaging in such self-dealing transactions; (iii) failing

21  to report transactions to Frost's primary lender; and (iv) failing to pay Frost employees' earned

22  bonuses over multiple years.

23  132.    By reason of Mr. Frigstad's and Mr. Bravard's positions, they owed Mr. Huntsman

24  and other minority shareholders fiduciary duties of loyalty and due care and were required to use

25  their utmost ability to control and manage Frost in a fair, just, honest, and equitable manner. Mr.

26  Frigstad and Mr. Bravard were required to act in furtherance of the best interests of Frost and its

27  minority shareholders, rather than in furtherance of their own personal interests and personal

28  benefit.

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626/2689

4888-6114-3953.5

COMPLAINT

133.    In acting as alleged in this Complaint, Mr. Frigstad and Mr. Bravard did not exercise the care or loyalty required of a director of a corporation. As a direct and proximate result of the acts attributable to Mr. Frigstad and Mr. Bravard alleged above, Mr. Huntsman has been damaged in an amount to be proven at trial, but no less than $6,490,000.

134.    Mr. Huntsman is informed and believes that by acting in the manner that they did, Mr. Frigstad and Mr. Bravard demonstrated fraud, oppression, and malice, and the intent to deprive Mr. Huntsman of his respective rights, thus justifying an award of punitive and exemplary damages in a sum according to proof.

## TWELFTH CAUSE OF ACTION

### (Violation of Cal. Labor Code § 202 – Unpaid Wages – Against All Defendants)

135.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint as if fully set forth herein.

136.    California has a strong public policy that favors full and prompt payment of wages due to an employee because "[i]t has long been recognized that wages are not ordinary debts, that they may be preferred over other claims, and that, because of the economic position of the average worker and, in particular, his dependence on wages for the necessities of life for himself and his family, it is essential to the public welfare that he receive his pay when it is due." *Kerr's Catering Service v. Department of Indus. Relations* (1962) 57 Cal.2d 319, 326

137.    California Labor Code Section 202 requires that an employer pay all wages earned and due to an employee promptly upon the employee's termination of employment.

138.    California Labor Code Section 218 allows a wage claimant to sue for "any wages or penalty due him under this article."

139.    After the termination of Mr. Huntsman's employment, Defendants failed to promptly pay Mr. Huntsman all wages owed to him as required under California Labor Code Section 202.

140.    Pursuant to California Labor Code Sections 202, 218, 218.5 and 218.6, Mr. Huntsman is entitled to recover from Defendants all earned and unpaid wages, including all

SNELL & WILMER

L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

1   penalties, reasonable costs, attorneys' fees and interest accruing from the date such wages were

2   earned.

3                            **THIRTEENTH CAUSE OF ACTION**

4        **(Violation of Cal. Labor Code §§ 202 & 203 – Waiting Time Penalties –**

5                                **Against All Defendants)**

6        141.    Mr. Huntsman incorporates by this reference all other paragraphs of this Complaint

7   as if fully set forth herein.

8        142.    California Labor Code Section 203 provides that if an employer willfully fails to

9   pay compensation promptly upon discharge, as required by California Labor Code Section 202, the

10  employer is liable for waiting time penalties in the form of continued compensation of up to 30

11  workdays.

12       143.    As detailed above, during Mr. Huntsman's employment, Defendants willfully failed

13  to pay Plaintiff all compensation earned by Mr. Huntsman upon termination of his employment.

14       144.    Consequently, Mr. Huntsman is entitled to recover from Defendants statutory

15  penalties pursuant to California Labor Code Sections 202 and 203, including attorneys' fees and

16  interest accruing from the date such wages were earned.

17                                **JURY TRIAL DEMAND**

18       Mr. Huntsman respectfully demands a trial by jury on all issues so triable.

19                                **PRAYER FOR RELIEF**

20       **WHEREFORE**, Mr. Huntsman requests judgment in his favor and against Defendants as

21  follows:

22       A.      An order from this Court awarding of monetary damages for each claim in an

23              amount to be determined at trial but not less than:

24       i.      $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and

25              interest as may be assessed by law for Claim 1, Breach of Contract against all

26              Defendants.

27

28

SNELL & WILMER
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689

ii. $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and interest as may be assessed by law for Claim 2, Breach of the Implied Covenant of Good Faith and Fair Dealing against all Defendants.

iii. $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and interest as may be assessed by law for Claim 3, Fraudulent Inducement against all Defendants.

iv. $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and interest as may be assessed by law for Claim 4, Promissory Estoppel against all Defendants.

v. $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and interest as may be assessed by law for Claim 5, Wrongful Discharge against all Defendants.

vi. $6,490,000 for lost earnings, lost bonuses, lost equity in Frost, lost employment benefits and opportunities and other losses, including costs, fees, and interest as may be assessed by law for Claim 6, Retaliation against all Defendants.

vii. An amount sufficient to compensate Mr. Huntsman for the wrongful withholding of compensation, including costs, fees, and interest as may be assessed by law for Claim 7, Fraudulent Inducement against all Defendants.

viii. $6,490,000 for unpaid bonuses and other compensation, including costs, fees, and interest as may be assessed by law for Claim 8, Conversion against all Defendants.

ix. An amount sufficient to constitute reasonable restitution of wages withheld and benefits wrongfully retained as well as an award of attorneys' fees, including costs, fees, and interest as may be assessed by law for Claim 10, Violation of California Unfair Competition Law against all Defendants.

x. $6,490,000 for harms caused as a direct result of Mr. Frigstad and Mr. Bravard's breaches of fiduciary duties, including costs, fees, and interest as may be assessed by law for Claim 11, Breach of Fiduciary Duty against Mr. Frigstad and Mr. Bravard.

1     xi.    $6,490,000 for unpaid bonuses and other compensation, including statutory waiting

2              time penalties, costs, fees, and interest as may be assessed by law for Claims 12 and

3              13;

4     B.    For any and all attorneys' fees, costs, and interest to which Mr. Huntsman may be

5              entitled;

6     C.    For punitive damages;

7     D.    For an accounting; and

8     E.    For such other and further legal and equitable relief as the Court deems appropriate

9              and/or necessary.

10 Dated: November 22, 2023              SNELL & WILMER L.L.P.

11

12                              By: */s/ Anthony J. Carucci*

13                                   Anthony J. Carucci
                                  Mark O. Morris

14                                   Elisabeth M. McOmber

15                           Attorneys for Plaintiff Darrell Huntsman

16

17

18

19

20

21

22

23

24

25

26

27

28

SNELL & WILMER
L.L.P.
LAW OFFICES
600 ANTON BLVD, SUITE 1400
COSTA MESA, CALIFORNIA 92626-7689